ISAIAH WALTON, plaintiff in error, *vs.* JAMES JORDAN, defendant in error.

An action of deceit may lie, notwithstanding the seller states that the property is unsound and refuses to warrant it on that account; still, to maintain a suit under such circumstances, the proof of fraud should be clear and unequivocal, especially where the purchaser enjoys equal opportunities with the seller, of judging of the condition of the property, and pays a 'reduced price on account of its acknowledged unsoundness.

Debt, in Fayette Superior Court. Tried before Judge BULL, at March Term, 1857.

This was an action of debt brought by Isaiah Walton against James Jordan, upon the following promissory note, to-wit:

By the 25th of December, next, I promise to pay Isaiah Walton or bearer, four hundred and fifty dollars, value received. This 10th August, 1853.

(Signed)          JAMES JORDAN.

The defendant pleaded the general issue; and further, that said note was given for a negro fellow named Jim, whom plaintiff fraudulently and deceitfully represented at time of the sale, to be not entirely sound, but a good hand and able to do good work, and that but little was then the

matter with him, when in truth and in fact said slave was incurably diseased and worthless, and so continued until he died.

### Brief of Evidence.

Plaintiff submitted the note and rested.

Defendant then introduced the following testimony:

*The Plaintiff* was sworn. Testified that the note sued on was given for a negro boy, Jim, which he sold to defendant; that he told defendant at the time he sold him the negro, that the boy was unsound; that he had done good work the year previous; that he was a better hand during the previous year than a yellow boy he had hired; that Jim had a very severe spell during the previous winter and spring, and that Dr. Steel had been attending on him, and he had got able to do good work again; that he was a tender negro; and that he did not consider him sound.

*Cross-examined.*—His statements as to the capacity of the boy to work, were true; that when Isdell went to see him, he (Isdell,) represented himself as the son of defendant; that he told Isdell that he was preparing to go to Texas, and he could not take the negro back; that he wanted the money to enable him to go to Texas; that near the 12th March, 1854, he went to see defendant, to get the money due on said note; that defendant proposed to give him two hundred dollars to take the negro back; he told defendant that since selling the negro, he had sold out, prepared to go to Texas and could not take him back; that Mr. Jordan, (def't,) told him that the boy had done him two or three months good work; and that they had a falling out, and he whipped the boy; and that he had run away, and had never been able to do him any work since; that he considered the boy rather deceitful,

The defendant then read the interrogatories of *Jeremiah D. Jordan*, as follows:

1st. He knows the parties.

2d. He states that he never heard any conversation between plaintiff and defendant, in relation to the negro man Jim, previous to the purchase by defendant.

3d. He says that Jim worked but a few days after defendant purchased him, before he laid up, not more than a week; from that time until 25th May, he continued sick or unable to work; on 25th May, 1854, he died; I do not think he was of any value to defendant; able physicians did attend him; I cannot say how long; one was called to see him when first attacked, and he attended him until he got a little better; when he was taken worse again, another was called in, and he attended until he died; cannot say how long either of them attended him.

4th. I was present at a conversation between plaintiff and defendant, after the purchase of the negro Jim, when defendant proposed to plaintiff, that if he would take the negro back, that he would give him two hundred dollars, or he would keep the negro and pay him two hundred and fifty dollars, to which proposition, plaintiff objected, saying that he would not own him any way it could be fixed.

5th. Defendant then told him that at the sale of the said negro, he, plaintiff represented said negro to be a good hand; and that he was not; that he had only been an expense to him; and that it did not look right for defendant to lose the the whole price of the negro; to which plaintiff replied, that he had to lose a heap more than that; that the negro cost him more than he got for him.

*Cross-interrogatories.*—1st. I never heard any conversation between plaintiff and defendant previous to the sale of the negro; about Christmas, 1852, plaintiff came to the house of defendant, to see him in relation to the sale of Jim, and defendant was from home, had gone to Fayette; plaintiff said he wished to sell him to him, on account of his having a wife there; that he was as good a hand as he ever had anything to do with; Jim had a woman of defendant's for a

wife; supposes for ten years; this took place in the absence of defendant, he was not about.

3d. I did not hear them make the trade, but have heard since that he was sold as an unsound negro.

4th. He does not recollect to have heard anything about defendant's cramping the business of plaintiff; he recollects plaintiff saying that he would not take the negro back any way it could be fixed; plaintiff, in that conversation said, that he did not sell the negro as a sound negro.

5th. He knows nothing further that will benefit plaintiff.

*John C. Jordan,* in answer to interrogatories, says:

1st. I know the parties.

2d. I was present when defendant purchased said negro boy Jim from plaintiff, and plaintiff recommended said boy to be a very good hand; said he could beat or outwork a mulatto boy who he, plaintiff, said was an extra good hand, and that the boy's health had so improved, that he had got to be a very good hand to labor, and was quite able to do so; this is in substance, all I know for defendant.

*Cross-interrogatories.*—1st. Defendant is my father, I am interested only as a child.

2d. I am about 35 years old; I went with defendant to Knoxville; he purchased the negro; I heard what I testify, in their conversation in the trade at Amos & Ellis' store, all of which I know of my own knowledge and not influenced by any one, and any more particular conversation than I have already stated, I do not recollect of; the above is in full of all I know or now remember.

*Dr. Homes Steel.*—1st. I know Isaiah Walton, but not James Jordan.

2d. I am a practicing physician, and have been for 16 years.

3d. I received a professional call to the family of Isaiah Walton, in Crawford county, Ga.; I never received a call to see a negro man, but a negro man whose name I do not now remember, was brought to my office for medical treatment, by Isaiah Walton, in the month of February, 1853; said negro

was diseased with a chronic inflammation of the stomach, involving the viscera generally, and particularly the liver.

4th. To the best of my recollection, I had said negro under my treatment for a month or six weeks; never knew him before he was brought to me for treatment, and have no recollection of seeing him afterwards; I was then of opinion that said disease, from its nature and tendency, would return from time to time, and finally destroy him.

*Mrs. Sarah Butts.*—1st. I know Jordan.

2d. I know the negro; my father owned the negro; I knew the negro for fifteen years; when father purchased the negro, he was about 35 years old; his name was Jim; I have not known the negro for the last 9 years.

3d. The negro was diseased when father purchased him; I do not know what the disease was; he repeatedly threw up, and complained inwardly, as long as I stayed at father's, and continued to get worse apparently.

4th. I do not know whether he died or not, with the disease he complained of, when I knew him; the negro was worth something; how much I do not know; I do not recollect of knowing the negro any more after that time; I did not see the negro about the time Jordan purchased him.

5th. I never saw the gentleman that sold the negro, and know nothing of the contract between the parties, nor do not know any thing about the purchase, or the conditions of the contract.

*Interrogatory.*—1st. I never owned the negro.

*Azariah Doss, Catherine M. Jordan, and Elizabeth R. Harper.*—1st. Witness Doss' says he knows the defendant but not plaintiff. The other two say, they are acquainted with plaintiff and defendant.

2d. Witness, Doss, answers, I have been a practicing physician, but had declined the practice sometimes, though I frequently practice among my neighbors gratuitously. I was called on by defendant, Jordan, in the latter part of the summer or fall of 1853, to examine and attend upon a negro man

Walton vs. Jordan.

by the name of Jim; I do not know from whom defendant purchased said negro, only from report; defendant purchased or brought him home in the latter part of the summer or at about that time, of 1853.

3d. Witnesses all answer, they were not acquainted with said negro at the time defendant brought the negro home; and, until his death, from the time of our first acquaintance with the negro, we considered him afflicted with a chronic disease, and died with the same disease; defendant purchased or brought the negro home in the latter part of the summer, or first of the fall, and the negro died the spring following, in the month of May; the negro was diseased from the time defendant brought him home until he died; the negro was treated kindly and humanely.

4th. The negro was chronically affected, and able to labor but little, at the time defendant brought him home, and in a short time ceased to labor any; was confined to his bed all of two-thirds of the time defendant owned him; He was afflicted chronically, and was confined two-thirds of his time, as above stated; he died in the month of May, 1854; he was treated kindly and humanely; we (the two female witnesses) attended him, with others of defendant's family; witness Doss with Drs. Robinson and Westmoreland were the attending physicians. The female witnesses: We heard Mr. Walton say the negro threw up blood while he owned him; also that defendant offered Walton the negro and two hundred dollars to take him back; Mr. Walton refused to take defendant's proposal, and stated that he would not take the negro back at any price.

*Cross interrogatory.*—Witness Doss answers, the nature and symptoms of the disease of which the negro was afflicted and died, were as follows, to-wit: tumefaction of the abdomen, enlarged and indurated liver, soreness and great pain and palpitation, even severe pain on the slightest touch over the region of the stomach, and left lobe of the liver, and ended in death; the time of the death of the patient afflicted

with this disease, is indefinite; the disease is curable or incurable, according to the stage to which it has progressed; but in this case I thought it incurable; it affects the patient with general languor, pain and inability to laborious actions.

*James L. Isdell's interrogatories.*—1st. He knows the parties.

2d. He knows a negro man by the name of Jim, once the property of plaintiff; he sold him to James Jordan.

3d. I know nothing of the constitution of said negro man while in possession of plaintiff; can't say what his condition was at the time of sale to defendant; I saw the negro man while in possession of defendant; he was drooping, and appeared to be in very bad health; he died in 8 or 10 months after defendant bought him; can't say what disease he died of.

4th. In conversation with plaintiff some time after the sale of said negro to defendant, he, plaintiff, said the negro was deceitful, and that he generally gave him a whipping, which done him more good than any thing else; we were talking about the negro at the time above; I offered him two hundred dollars to take the negro back from defendant, in consequence of his unsoundness; he said he had sold the negro for the money, and nothing else would do him but the money; we were at Castleberry's store, below Knoxville, in Crawford county; it was the last of the same year that plaintiff sold the negro.

*Cross interrogatories.*—1st. He answered, he never knew plaintiff before the time of the conversation with him at Castleberry's store, as above stated; he was talking to me; I went to see him about the negro, for the purpose of getting him to take him back; I told Mr. Jordan I would swear what I have about the matter; no person present, &c.

*Robert Westmoreland's interrogatories.*—1st. I am acquainted with defendant, not with plaintiff.

2d. I practiced medicine on a negro man by the name of Jim, about forty or forty-five years old; in the spring of 1854 I practiced medicine on him; I was then and now a practi-

cing physician; I attended as a physician; the negro was diseased; he was diseased at the time mentioned above; I consider the disease, from a minute diagnosis, of a complicated nature; his disease was chronic hippatitis hydrothorax; from the appearance of the negro, I considered that he had been diseased for many years.

3d. I believe it resulted in the death of the negro; when I was called on to attend on him, I thought it very doubtful whether I could cure him or not, and he died at the time of my attendance; the time of the attendance was the time above mentioned, in the spring of 1854; I was employed on conditions; the condition was that if I relieved the boy so he could get about, I was to receive pay, and if not, I was not to receive pay.; I did not know how much the negro was worth at the purchase; at the time of the attendance to him he was worth nothing.

5th. I have already stated the nature and character of the disease, and further, I considered the negro incurable at the time I attended him; I have stated fully all I now recollect..

Defendant closed and plaintiff introduced :

*Interrogatories of Elijah M. Amos and John W. Ellis.*
1st. We know the parties.
2d. We were present when plaintiff sold defendant a certain negro man, for which defendant gave plaintiff his note. Plaintiff said he would not warrant the negro to be sound and defendant did not require it, but said that he had known the negro longer than the plaintiff had known him; cannot state precisely the conversation, but knows that it was understood by the parties that said negro was not sold as sound property.

3d. They know of nothing more going to show that plaintiff gave defendant full information with regard to the unsoundness of said negro. Witness Amos, believes that he wrote the note and bill of sale for said negro, but does not

now remember whether in said bill of sale, plaintiff express-
ly refused to warrant said negro or not.    They know nothing
that will benefit plaintiff.

*Cross-interrogatories.*—1st. Witnesses and Commissioners
are present.

2d. They say that all they know with regard to represent-
ations made by plaintiff to defendant, are set forth in answer
to the second direct interrogatory.

3d. They do not remember precisely the sum given for the
negro, but believe it was about four or five hundred dollars;
and do not remember that any one was present except the
parties to this suit, and witnesses.

4th. They do not know any thing of their own knowledge
with regard to the negro's ability to work, but were present
at the trade.

5th. They cannot state any more of the conversation than
is set forth in answer to second direct interrogatory.    Plain-
tiff has talked with us on the subject during the past year;
they know of nothing that will benefit defendant.

*Interrogatory of Jesse Dunn and Joel Hancock.*—1st. Jes-
se Dunn answers he thinks he has seen plaintiff and knows
defendant.

2d. I was not present at the time the trade was made, but
heard defendant say, next morning, what he did give, and
thinks it was four hundred and fifty dollars.

3d. The morning after the trade was made, he heard de-
fendant say that he would not take five hundred dollars for
the boy, and appeared to be very well pleased.

Joel Hancock answers to the first:    He knows defendant,
but never saw plaintiff. .

2d. He heard defendant say that plaintiff asked defendant
five hundred dollars, but he would not give him that, but he
said he gave him four hundred and fifty dollars; and he fur-
ther said that he was willing to risk that amount of money
on the health of the negro.

Walton vs. Jordan.

3d. He knows nothing more that will benefit plaintiff. Here the plaintiff closed.

The Court charged the jury, among other things, that they must find for the plaintiff the whole note or nothing; that there was in this case no evidence to enable them to ascertain the measure of abatement, there being no evidence of the actual value of the negro at the time of sale. That the plaintiff was entitled to recover the whole amount of the note unless the defendant was deceived and injured, by the fraudulent misrepresentations, artifice or concealments of the plaintiff, in relation to the condition of the negro.

The jury found for the defendant, and counsel for the plaintiff moved for a new trial, on the ground, that the verdict was contrary to law and evidence, and the charge of the Court, and that the charge itself was erroneous and contrary to law.

The motion for a new trial was overruled, and counsel for plaintiff excepted.

MARTIN; TIDWELL & WOOTEN, for plaintiff in error.

DOYAL, *contra.*

*By the Court.*—LUMPKIN J., delivering the opinion.

It is not right that the plaintiff should recover nothing of the defendant, upon the proof in this case. When the seller refuses to warrant the soundness of property, but on the contrary, states to the purchaser that it is unsound, it should take very strong proof to relieve him from the payment of the money. We recognize the doctrine, that an action for deceit will lie, not only where the seller fails, but expressly refuses to warrant the property as sound, but, on the contrary, represents it to be unsound. But in the latter case, we repeat, the testimony should be much stronger than in the former, to

maintain the action.   Such was not the nature of the evidence in this case.

. In addition to this, the buyer had as good, if not a better opportunity of knowing the condition of the negro, as to health, than Walton.   And so he admitted.   After all, what were the fraudulent representations, that constitute the gravamen of this complainant?   Why, that Jim did as good, if not better work the year he was sold than a yellow fellow that Walton had as a hireling.   And that he was a good worker.   Have these statements been disproved?   If so, how?   By showing that soon after the boy was sold, his health rapidly declined; and that he died in May, 1854, having been bought the August before.

. Does this demonstate the falsehood of Walton's representations?   The proof shows that the negro failed faster than probably either Walton or Jordan anticipated.   But does not make out necessarily, a case of deceit against Walton.

True, the evidence is conflicting to some extent, still, when carefully compared, it will be found that the alleged misrepresentations of Walton, as to the condition of the slave, are not sufficiently confuted.   And when we take into consideration his frank admissions, as to the unsoundness of the boy, his refusal to warrant him, the very inadequate price paid, provided the negro had been sound, the offer of Jordan to pay him $250, we are unwilling that a general verdict for the defendant should stand.   It would seem that justice had not been done in this case.

Judgment reversed.